STATE OF MAINE
CUMBERLAND, ss

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-12-312

UAW — Cum - 12/31/2013

CHARLES and KATHY
REMMEL, et. al.

    Plaintiffs

v.

CITY OF PORTLAND, et. al.

    Defendants

ORDER ON MOTION FOR
SUMMARY JUDGMENT

STATE OF MAINE
Cu... ...k's Office

DEC 3 1 2013

RECEIVED

This matter is before the Court on the defendants' motion for summary judgment.

The plaintiffs have also requested judgment in their favor.

Factual and Procedural Background

This case concerns the Portland city council's decision to approve a conditional

zoning change to a single property located in Portland's West End. The property, located

at 32 Thomas Street, was formerly used as the Williston-West Church from 1877 to 2011.

(Pls.' A.S.M.F. ¶ 2). In 2011, the Williston-West Church merged with the Immanuel

Baptist Church and listed the property at 32 Thomas for sale in November 2011. In

December 2011, defendant 32 Thomas Street ("Thomas Street") purchased the property.

(Supp. S.M.F. ¶ 2.) The property includes two structures, a sanctuary, which was

previously used as the church, and a parish house, previously used as a supporting

building.[1] (Supp. S.M.F. ¶ 2.)

---

[1] The Parish Hall has recently been used as a day care center. (R at 378.)

The property is located in an area zoned as R-4 Residential. (Opp. S.M.F. ¶ 1, 9.) The R-4 zone does not permit general commercial uses. (Opp. S.M.F. ¶ 10.) Notwithstanding the designation as an R-4 zone, the City Code allows for conditional or contract zoning[2] subject to certain requirements, including being consistent with the City's comprehensive plan:

> conditional or contract zoning is hereby authorized for rezoning of property where, for reasons such as the unusual nature or unique location of the development proposed, the city council finds it necessary or appropriate to impose, by agreement with the property owner or otherwise, certain conditions or restrictions in order to ensure that the rezoning is consistent with the city's comprehensive plan. Conditional or contract zoning shall be limited to where a rezoning is requested by the owner of the property to be rezoned. Nothing in this division shall authorize either an agreement to change or retain a zone or a rezoning which is inconsistent with the city's comprehensive plan.

Code of Ordinances, City of Portland, Me ("Code") § 14-60 (eff. July 17, 2007).

After acquiring the parcel with the knowledge of the location's zoning restrictions, Thomas Street filed a conditional zoning application for the property. (Reply to Pls.' A.S.M.F. ¶ 9; Pls.' A.S.M.F. ¶ 13.) Defendant intends to develop the property for partial use as office space for Majella Global Technologies ("Majella"), a software development company with offices currently located in the Time and Temperature Building in downtown Portland. (Pls.' A.S.M.F. ¶ 15.) In the final version of its conditional zoning application, Thomas Street proposed to use 2800 square feet of the parish house for office space with a limit of 14 non-resident employees working in the space at any one time. (Pls.' A.S.M.F. ¶¶ 13-14.) As part of the conditional rezoning

---

[2] Conditional zoning is defined as "the process by which the municipal legislative body may rezone property to permit the use of that property subject to conditions not generally applicable to other properties similarly zoned." 30-A M.R.S.A. § 4301(4). Contract zoning refers to "the process by which the property owner, in consideration of the rezoning of that person's property, agrees to the imposition of certain conditions or restrictions not imposed on other similarly zoned properties." 30-A M.R.S.A. § 4301(5). The terms are used interchangeably in this order.

2

agreement ("CZA"), Thomas Street agreed to undertake several rehabilitation projects for the historic buildings on the property. (Supp. S.M.F. ¶ 27.) Thomas Street submitted its application to the City Planning Board, which held a hearing, accepted public comments, and further refined the CZA. (Supp. S.M.F. ¶¶ 29-31.)

On May 29, 2012, the Planning Board voted 5-2 to recommend Thomas Street's application for conditional rezoning to the city council. (Supp. S.M.F. ¶ 32.) The Board found that the proposed project is consistent with the Comprehensive Plan of the City of Portland ("PCP") and that it is consistent with existing and permitted uses in the "surrounding area." (Supp. S.M.F. ¶ 33.) The city council held a public hearing and ultimately approved the CZA on June 18, 2012. (Supp. S.M.F. ¶¶ 56-57.)

On July 27, 2012, plaintiffs, who all own property abutting or near the rezoned property, filed their complaint requesting declaratory judgment that the CZA is unlawful. In May 2013 defendants moved for summary judgment. The parties have stipulated to the record that was before the city council and agree that the case can be resolved on summary judgment. The plaintiffs challenge the council's decision on the following grounds: in Count I that it is inconsistent with the city's comprehensive plan, in Count II that it is inconsistent with existing and permitted uses in the original zone, in Count III that it constitutes illegal "spot zoning," in Count IV that it is not supported by the evidence, and in Count V that the city council improperly delegated authority to the Planning Board to approve the conditional use of the sanctuary as a community hall.

## Discussion

Although a declaratory judgment action and not an 80B appeal is the proper procedure for challenging an improper zoning decision, the Court's review is limited to

3

the record that was before the city council when it made its decision to conditionally rezone the property. *F.S. Plummer Co. v. Town of Cape Elizabeth*, 612 A.2d 856, 859 (Me. 1992); *Vella v. Town of Camden*, 677 A.2d 1051, 1053 (Me. 1996).

### 1. Comprehensive Plan

State law requires every municipality to adopt a comprehensive plan, and all zoning actions must be consistent with that plan. 30-A M.R.S.A. § 4352 (2012); *LaBonta v. City of Waterville*, 528 A.2d 1262, 1265 (Me. 1987). Conditional or contract zoning, while expressly permitted by statute, is no exception. 30-A M.R.S.A. § 4352(8); *Vella*, 677 A.2d at 1053. The Law Court has interpreted consistency to mean "in basic harmony with" the plan. *LaBonta*, 528 A.2d at 1265. Because amending a zoning ordinance is a legislative act, on review "the record is limited to the record before the municipality's legislative body, deference is given to the judgment of the legislative body, and the challenger bears the burden of proving that the amendment is inconsistent." *Golder v. City of Saco*, 2012 ME 76, ¶ 11, 45 A.3d 697.

The PCP is a lengthy two-volume document that includes broad citywide goals and more detailed, targeted policies to achieve those goals. Plaintiffs argue that the CZA is not in harmony with the PCP's emphasis on encouraging decent housing and respecting neighborhood integrity. Defendants argue that the rezoning is consistent with the plan's goals of economic development, neighborhood livability, and historic preservation.

#### a. Protecting Residential Neighborhoods

One goal of the PCP is to "maintain and enhance the livability of Portland's neighborhoods as the City grows and evolves through careful land use regulation, design

4

and public participation that respects neighborhood integrity." PCP Vol 1, 45. As part of this goal, the PCP contains the following policies:

- o While accommodating needed services and facilities, protect the stability of Portland residential neighborhoods from excessive encroachment by inappropriately scaled and obtrusive commercial, institutional, governmental, and other non-residential uses.
- o Support Portland's livable neighborhoods by encouraging a mix of uses that provide goods and services needed and are within walking distance of most residents.

PCP Vol. 1, 45. The PCP also includes various policies that encourage expanding housing opportunities in residential districts. PCP Vol. 1, 45.

In *LaBonta*, the Court specifically noted that "the Waterville comprehensive plan identified certain residential areas to be protected, but the residential area in the vicinity of the proposed Shaw's development on Kennedy Memorial Drive was not one of them." *LaBonta*, 528 A.2d at 1264 n.6. The PCP does identify the R-4 zone as a residential area to be protected. *See* PCP Vol. 2, 63 ("The intent of the zone is to preserve the unique character of the Western Promenade area of the city . . . ."). While the PCP emphasizes the need to maintain neighborhood integrity through careful planning, it also allows for "accommodating needed services and facilities" and "a mix of uses that provide goods and services needed." There is no evidence in the record, however, that the CZA provides any needed services, facilities, or uses for the R-4 zone. Rather, the evidence unambiguously shows that the CZA provides office space for a single business in the heart of a residential neighborhood. (Pls.' A.S.M.F. ¶ 21.)

Defendants rely on other provisions in the PCP in an attempt to show consistency with the plan. If the CZA is consistent with one of several conflicting goals in the plan, the Court must defer to the judgment of the legislative body. *See Adelman v. Town of*

5

*Baldwin*, 2000 ME 91, ¶ 24, 750 A.2d 577 (holding that a rezoning decision allowing a communications tower, which did not further some goals of the plan, was consistent with "other sections of the comprehensive plan which may be interpreted to encourage the development of the communications tower"). While the CZA may be inconsistent with the residential and housing goals of the PCP, defendants argue that it is consistent with the PCP's goals of economic development, neighborhood livability, and historic preservation.

### b. Economic Development

Defendants rely on general statements in the PCP to support their claim that the CZA furthers the plan's economic development goals. A stated goal of the PCP is "to promote an economic climate which increases job opportunities and overall economic well-being." PCP Vol. 1, 37. The plan calls for strengthening the economic base in the city by working to:

- create a variety of job opportunities for the full spectrum of the labor pool which:
  - are appropriate to our current and potential skills
  - provide good pay and benefits – a livable wage
  - are rewarding/satisfying;
    . . .
- strengthen and diversify the tax base

PCP Vol. 1, 37. Other general goals include "reduc[ing] the tax burden on residential property owners" and "mak[ing] Portland attractive to new residents and businesses." PCP Vol. 1, 37-38.

These statements, however, must be considered in the larger context of the PCP, which seeks to "[a]ccomodate the City's commercial activity within a range of functionally and physically designed commercial centers." PCP Vol. 1, 28. The PCP

6

identifies various business zones such as the B-1 neighborhood business zone and the B-5 urban commercial mixed-use zone where commercial activity is a priority. PCP Vol. 2, 68-72. While encouraging commercial development in these areas, the PCP also seeks to "protect neighboring residential zones." PCP Vol. 1, 38. Unlike in *LaBonta*, where commercial development at the site of the rezoning was an explicit goal of Waterville's comprehensive plan, nothing in the PCP makes commercial development a priority in the original R-4 zone. *See LaBonta*, 528 A.2d at 1265. A description of the R-4 zone in the PCP focuses exclusively on housing issues. PCP Vol. 2, 63.

The CZA also fails to advance the general goals of economic development outlined in the PCP. The CZA was not approved to allow a new business to move to Maine but to provide office space to a business that is currently located downtown in a commercially zoned area. (Pls.' A.S.M.F. ¶ 15.) Contrary to the city's arguments, there is no evidence in the record that the city will gain jobs or realize an increase in tax revenue from the CZA. Thus, the City of Portland will not receive a net economic benefit from the CZA.

c. Neighborhood Livability

Defendants also argue that the CZA enhances the livability of the R-4 zone by promoting mixed, compatible uses. Defendants rely on the following statements about accommodating mixed uses and compatible development in the PCP:

- Compatible Development: well-planed developments and uses to enhance compatibility between residential and non-residential uses; and
- Neighborhood Livability: Promote through city policies a mix of housing types, retail and service businesses, community services, and open space/recreation opportunities of appropriate size, scale and type within neighborhoods.

7

(Supp. S.M.F. ¶ 51-52.)[3]

The defendants fail to show how the CZA advances either of these policies. There is no evidence in the record that Majella is a retail or service business that is needed in the R-4 zone. Moreover, nothing in the PCP calls for this type of mixed-use development within the zone. Thus, the CZA does not advance the PCP's "neighborhood livability" goals.

### d. Historic Preservation

The defendants' strongest argument is that the rezoning is consistent with the PCP's goal of historic preservation. One of the primary goals of the PCP is "to preserve the State's historic and archaeological resources." PCP Vol. 1, 71. Both the parish house and the sanctuary are listed in the National Register of Historic Places, and they are recognized as historical sites by the City. (Supp. S.M.F. ¶ 6.) There is no dispute that preserving these two buildings is consistent with the PCP. Even without the CZA, however, the property owner would be required to preserve the property under the historic preservation ordinance. *See* Code § 14-690(a) ("All landmarks, and all contributing structures located in an historic district shall be preserved against decay and deterioration . . . by the owner and any other person or persons who may have legal custody and control thereof.")

Defendants erroneously conclude that the historic preservation ordinance is a component of the PCP. The ordinance is a means of implementing the plan, not the plan itself. *See Nestle Waters N. Am, Inc. v. Town of Fryeburg*, 2009 ME 30, ¶ 24, 967 A.2d 702 ("The plan sets out what is to be accomplished; the ordinance sets out concrete

---

[3] The sections of the PCP defendants cite do not contain these statements. Plaintiffs nevertheless admit that they are in the PCP. (Opp. S.M.F. ¶ 52.)

standards to ensure that the plan's objectives are realized.") The ordinance already imposes a duty on the property owner to preserve historic buildings. *See* Code § 14-690. The City therefore cannot rely on the historic preservation ordinance to justify the CZA.

The City nevertheless argues that the CZA contains additional restoration projects that exceed the requirements of the historic preservation ordinance. The developer agreed to replace the roof with slate and copper, which is not required by the ordinance because the original slate roof had already been replaced. (Pls.' A.S.M.F. ¶ 20; Reply to Pls.' A.S.M.F. ¶ 20; R. at 439.)

Despite the historic preservation aspects of the CZA, the Court is convinced that the city council could not have rationally concluded that the CZA is "in basic harmony with" the PCP. Unlike *LaBonta*, this case does not involve a property that had been vacant for 58 years. *See LaBonta,* 528 A.2d at 1265 ("[T]he area that the city council rezoned commercial had been zoned residential for 58 years and still at the time of the rezoning no house had been build within it.") Nor does the PCP in any way target the R-4 zone for commercial development as the Waterville plan did in *LaBonta. Id.* at 1264-65. Furthermore, this case does not present the situation in *Adelman,* where the municipality was forced to choose between competing goals in the comprehensive plan. In *Adelman,* the zoning changes advanced several goals in the comprehensive plan that would not have been accomplished absent the changes. *See Adelman,* 2000 ME 91, ¶ 24, 750 A.2d 577 (finding that with the zoning change, "the Town diversifies its tax base; increases local job opportunities; addresses the needs of all the townspeople; and protects the rural community by preserving 320 acres of undeveloped land for hiking and hunting"). Although the CZA furthers the PCP's goal of historic preservation, that goal would be

9

accomplished regardless of this deal. Without the CZA, the City will meet its goals of protecting residential neighborhoods and historic preservation. With the CZA, the City only advances one of these goals. On the whole, therefore, the CZA fails to strike "a reasonable balance among the City's various zoning goals." *Id.* at 1265.

2. Existing and Permitted Uses

In addition to consistency with the comprehensive plan, Maine law requires that conditional rezoning "establish rezoned areas that are consistent with the existing and permitted uses within the original zones." 30-A M.R.S.A. § 4352(8)(B). When interpreting a zoning ordinance, "the language at issue must be construed reasonably and with regard to both the ordinance's specific object and its general structure." *Kurlanski v. Portland Yacht Club*, 2001 ME 147, ¶ 9, 782 A.2d 783. "Consistent" again means "in basic harmony with existing and permitted uses" in the original zone. *See McMillan v. City of Portland*, 2005 Me. Super. LEXIS 164, *16 (Nov. 22, 2005).

In *McMillan*, the Superior Court (Cumberland, Crowley, J.) decided that 30-A M.R.S.A. § 4352(8) "does not prohibit the introduction of new uses in the area." *Id.* To hold otherwise, the court found, "would render the zoning amendment process superfluous." *Id.* The court was presented with the question of whether a mixed use development project that included a supermarket, green space, office space, and new housing was consistent with existing and permitted uses in the rezoned area. *Id.* at *3, 16 The court reasoned:

> Here, the contract zone contains two existing and permitted establishments, a restaurant and a boxing club. The City Council could rationally have concluded on the evidence presented to it that the proposed mixed-use commercial/residential development for which they were approving the conditional zone would be in harmony with these existing and permitted uses.

10

Id. at *16-17. Under *McMillan*, new uses are not automatically prohibited. Rather, the *McMillan* court looked to the permitted and existing uses in the original zone.

The R-4 zone's stated purpose is "to preserve the unique character of the Western Promenade area of the city by controlling residential conversions and by allowing the continued mix of single-family, two-family, and low-rise multifamily dwellings and other compatible development at medium densities." Code § 14-101. Permitted uses in the zone include various residential units and "other" uses, including cemeteries; parks and other noncommercial recreation areas; accessory uses; home occupations; municipal uses; special needs living units; and certain wind energy systems. Code § 14-102. The zone also provides for conditional uses, which are uses allowed "only upon the issuance of a conditional use permit." Code § 14-103. These uses include additional residential structures such as group homes and shelters; institutional uses such as schools and places of assembly; community halls; private clubs; off-street parking; utility substations, day care facilities and nurseries; and wind towers and energy systems. Code § 14-103. All other uses are prohibited. Code § 14-104. The proposed office space is prohibited absent a change to the zoning at that location. (Supp. S.M.F. ¶ 14.)

Other than permitted home occupations, there is no evidence in the record that there are existing and permitted business or commercial uses in the R-4 zone. (Pls.' A.S.M.F. ¶¶ 10, 21.) Unlike *McMillan*, where the original zone contained commercial enterprises including a boxing club and a restaurant, the R-4 zone contains no non-residential businesses.

At least one member of the city council explicitly considered existing and permitted uses in the neighboring R-6 zone. (Supp. S.M.F. ¶ 42.) This was improper. The

11

statute unambiguously requires that the rezoned use be consistent with existing and permitted uses "within the original zones." 30-A M.R.S.A. § 4352(8). The city council cannot look to neighboring zones to find consistent uses because that would ignore the plain meaning of the statute. *See In re Adoption of M.A.*, 2007 ME 123, ¶ 9, 930 A.2d 1088 ("In construing a statute, we look first to its plain meaning."). The CZA adopted by the city council nevertheless includes language that "the proposed uses of the Property are consistent with existing and permitted uses in the neighborhood . . . ." (Supp. S.M.F. ¶ 58.) The planning board similarly erred when it found that the proposed office space was consistent with uses in the "surrounding area." (Supp. S.M.F. ¶ 33.) Uses in the "neighborhood" and "surrounding area" are not relevant to the statute's requirement that contract zoning uses be consistent with uses in the "original zones."

Defendants argue that the CZA is consistent with the "home occupation" permitted use in the R-4 zone. "The purpose of home occupations is to allow the secondary and incidental use of a residence for the conduct of appropriate occupations whose external activity levels and impacts are so limited as to be compatible with the residential character of the neighborhood." Code § 14-410; *see also Baker v. Town of Woolwich*, 517 A.2d 64, 67 (Me. 1987) (explaining that home occupations allow "only those businesses that do not adversely affect or undermine the residential character of the neighborhood"). Home occupations are limited to the lesser of 500 square feet or 25% of the floor area of the dwelling unit. Code § 14-410. Only one non-resident employee is permitted to work at a home occupation. *Id.* The City Code also specifies the only 28 professions that are eligible for home occupations. Code § 14-419. Computer programming is one of the listed professions. *Id.* However, a commercial, software

12

development company with fourteen non-resident employees is not within the definition of one of the listed professions. Nor is this consistent with the "home occupation" permitted use in the R-4 zone.

Defendants claim the proposed development is nothing more than an expanded computer programming home occupation. According to the defendant, the difference between a home computer programming business and Majella's business is not one of use but of scale. The Court disagrees with this line of reasoning.

The home occupations use explicitly limits the scale of the business because only one non-resident employee is permitted. Majella's proposed office space would allow up to 14 non-resident employees at a time. This is a substantial increase in the number of employees and it is not "so limited as to be compatible" with other residential uses in the zone as required for home occupations. Under defendant's logic, office space of any size could be justified in the R-4 zone because it would amount to the same use on a larger scale.

The office space is also not "secondary and incidental" to the residential function of the property, as contemplated by the home occupations use. General office space is not analogous to a home occupation limited to a small portion of a person's home. The primary use of a home with a home occupation is still as a residence. Thus home occupations are consistent with the R-4 zone's residential character. Commercial office space, on the other hand, is a clear outlier in the R-4 zone.

Defendants also argue that because the R-4 zone allows schools and nurseries, buildings that must necessarily contain offices, the proposed office space is consistent with uses already present in the zone. These permitted institutional uses, however, serve

13

the residential aspects of the R-4 zone. They serve essential functions in the community. The office space proposed by defendants does not serve any analogous community function. Moreover, the Court does not look to job activities that might occur in the permitted uses in the zone, it looks to the permitted uses themselves. *See* 30-A M.R.S.A. 4352(8). "Permitted use" refers to uses specifically allowed in a zoning ordinance and cannot be conflated with "activities that occur within the permitted uses in the zone." *See* Code § 14-104 (prohibiting all uses not expressly listed as permitted or conditional uses).

Counts III and IV

In Count III, plaintiffs allege that the city council's action constitutes illegal spot zoning. This argument is subsumed by counts I and II of plaintiffs' complaint. *See City of Old Town v. Dimoulas*, 2002 ME 133, ¶ 20, 803 A.2d 1018 ("In order to be illegal spot zoning, the ordinance . . . must be inconsistent with the city's comprehensive plan . . . .").

In Count IV, plaintiffs allege that the city council's decision is not supported by the evidence in the record. This is not a separate claim for relief but a standard of review. *Golder*, 2012 ME 76, ¶ 11, 45 A.3d 697.

Accordingly counts III and IV of plaintiffs' complaint can be dismissed.

Vagueness and Improper Delegation

Count V of plaintiffs' complaint, alleges that the city council improperly delegated authority to the Planning Board to set conditions for future use of the sanctuary as a community hall. As the Court understands the current state of this case, Thomas Street has yet to file a conditional use application for the sanctuary. Thus, the issue is not ripe for review.[4] *Schmidt v. Town of Northfield*, 534 A.2d 1314, 1317 (Me. 1987) ("An

---

[4] The Court also notes that community halls are permitted conditional uses within the R-4 zone. Code § 14-103(b)(2)(e). Conditional uses require a permit but not rezoning by the city council. *See* Code § 14-474.

14

administrative agency should be protected from judicial interference until the parties are affected in a concrete way by a formalized administrative decision.").

Accordingly, count V of the complaint is dismissed.

The entry is:

- Defendants' motion for summary judgment is DENIED;
- Plaintiffs' request for judgment is GRANTED on counts I and II;
- Counts III, IV, and V of the Complaint are DISMISSED

Dated: December 31, 2013

Joyce A. Wheeler
Justice, Superior Court

All Plaintiffs except Delogu-Bruce McGlauflin Esq
Orlando Delogu-Pro Se Plaintiff
City of Portland-Danielle West-Chuhta Esq
32 Thomas Street LLC-Mary Costigan Esq

15